

IN THE

# Court of Appeals of Indiana

In re Petition to Docket Trust of B. Alice McCoy

Michael D. McCoy,

*Appellant-Petitioner*



FILED

May 08 2026, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Douglas M. McCoy,

*Appellee-Respondent*

---

May 8, 2026

Court of Appeals Case No.
25A-TR-367

Appeal from the Monroe Circuit Court

The Honorable Geoffrey J. Bradley, Judge

Trial Court Cause No.
53C01-2110-TR-275

---

**Vaidik, Judge.**

# Case Summary

B. Alice McCoy was diagnosed with Alzheimer's disease in 2009. In early 2012, she and her husband, Morris, decided to change their estate plans so that one of their three children, Michael, wouldn't receive any of their rental properties. Morris and Alice hired an attorney, who prepared the documents, including revocable trusts, and met with Morris and Alice to review and execute them in August 2012. After Alice died in 2021, Michael filed her trust with the trial court and moved to set it aside on grounds that she lacked testamentary capacity in August 2012.

Before trial, Michael deposed the attorney, who denied knowing anything about Alice's mental or medical condition before August 2012 and denied that family members had reported any cognitive decline to him before then. Six months after the deposition and two business days before the bench trial, the attorney turned over two emails. In the first email dated March 2012, the attorney wrote to his law partner that Alice (1) "probably" has "very early Alzheimer's," (2) her family members "do not openly admit her developing limitations," and (3) he didn't know if her family knows that she isn't qualified to serve as trustee of Morris's trust. In the second email dated April 2012,

Morris told the attorney that (1) Alice is "seeing a neurologist" and "taking 2 kinds of medicine"; (2) he might be able to get her declared incompetent if the attorney thought it "would help"; and (3) Alice "does not understand everything she is signing."

[3] At trial, the parties agreed to admit the attorney's deposition in lieu of his live testimony. Michael moved to admit the emails, arguing that they impeach the attorney's credibility and would help the court evaluate the opinions of certain expert witnesses under Indiana Evidence Rule 703. The trial court excluded the emails on hearsay grounds without ever reviewing them. The court concluded that Alice had testamentary capacity in August 2012 and therefore her trust is valid. Michael now appeals.

[4] As a matter of first impression, we hold that under Indiana Evidence Rule 806, when a hearsay statement, such as the attorney's deposition here, has been admitted into evidence, the hearsay declarant's credibility may be attacked as though they had testified in person. The trial court erred in not admitting the emails for this purpose. The court also erred in not allowing Michael to refer to the emails during his direct and cross-examination of the experts so that the court could evaluate their opinions. Because the emails went to the key issue in this case, we vacate the court's order. On remand, the court shall admit the emails, reweigh the evidence, and issue a new order.

# Facts and Procedural History

[5] Morris and Alice McCoy were married for 67 years and had three children: Janet, Michael, and Douglas. This case involves two of those children: Michael, who lives in Montana, and Douglas, who lives in Bloomington. Morris and Alice owned rental properties in Bloomington, which they managed themselves from approximately 1968 to 2011. They also owned real estate in Montana with Michael and his wife. From 1997 to 2011, Morris and Alice visited Michael and his wife in Montana once a year for several weeks.

[6] Michael began noticing changes with his mother's health in 2007. During Morris and Alice's yearly visit to Montana, Michael noticed that Alice was getting lost, couldn't find the bathroom, was shuffling her feet, and was engaging less. In addition, at the 2007 funeral for Alice's brother-in-law, whom she knew very well, Alice didn't know whose funeral she was attending.

[7] In October 2009, Alice, then age 77, began seeing Dr. Jamie Bales, a neurologist in Bloomington. During the appointment, Morris reported that Alice was having memory problems, which had been getting worse over the past three years. *See* Ex. Vol. 1 p. 131 ("Husband gives most of the history as [Alice] feels her memory is fine. Having memory problems. Getting more confused. . . . Son noted problems 3 years ago. Getting worse over 3 years."). Alice was diagnosed with moderate Alzheimer's disease. Alice saw Dr. Bales again in June 2011, and Morris reported that Alice had been "declining." *Id.* at 125.

[8]     Through the years, Alice underwent several Mini Mental State Examinations (MMSE), which are tests "used as a screening tool to check for cognitive impairment." Joint App. Vol. 2 p. 21. The suggested guidelines for determining the severity of cognitive impairment are as follows: (1) mild (21-30); (2) moderate (10-20); and (3) severe (0-9). Alice's MMSE scores with Dr. Bales were as follows:

> 2009: 21
>
> June 2011: 16
>
> September 2011: 18
>
> March 2012: 17
>
> September 2012: 16

*Id.*

[9]     In the fall of 2011, Michael flew to Indiana and drove Morris and Alice to Montana for their yearly visit. This was the first time that Morris and Alice didn't drive themselves. During this visit, Michael noticed that Alice did not "really comprehend[]" being there. Tr. Vol. 3 p. 101. Michael's wife also noticed that Alice was having issues, including incontinence. At the end of their visit, Michael's wife drove Morris and Alice back to Bloomington. Upon returning, Michael's wife helped Morris and Alice find a company to take over management of their rental properties. When it came time to sign the contract,

Morris had to tell Alice how to spell her name. This prompted Michael's wife to recommend that Morris obtain a power of attorney for Alice.

[10] In early February 2012, Morris and Alice decided to make changes to their 1996 estate plans and contacted Bloomington attorney Michael Carmin. Attorney Carmin knew Morris and Alice through Douglas and their church and had done other work for them. Also around that time, Alice had her annual wellness check with her family physician and scored an 18 on her MMSE.

[11] Attorney Carmin met with Morris and Alice on February 28. While Morris took the lead, Alice "contributed" to the discussions. Joint App. Vol. 2 p. 23. Morris was upset with Michael's "financial management" and wanted him and Alice to "get out" of their involvement with the Montana real estate (including any loans on it), and Alice expressed "disappointment" in Michael "as a mother." Ex. Vol. 4 pp. 126-27. In short, they wanted to treat the Montana real estate as an early inheritance to Michael. They wanted to give two rental properties each to Janet, Michael, and Douglas; however, they designated the two least valuable ones for Michael. *See* Ex. Vol. 2 pp. 133-34. Attorney Carmin suggested revocable trusts.

[12] After the initial meeting, Morris emailed Attorney Carmin that he and Alice had changed their minds and decided **not** to leave any of the rental properties to Michael, meaning they would all go to Janet and Douglas. *See id.* at 139.

[13] Five months after the initial meeting, on July 27, 2012, Attorney Carmin's office sent Morris and Alice a draft of their estate-planning documents,

including Durable Powers of Attorney, Health Care Durable Powers of Attorney, Living Will Declarations, Pour-over Wills, and Revocable Trust Agreements. *See id.* at 149. The documents established that Michael would receive the Montana real estate subject to any debt and Janet and Douglas would split the Bloomington rental properties. *See id.* at 150. The documents designated Morris as Alice's Durable Power of Attorney, Personal Representative, and Trustee but did **not** designate Alice in any corresponding role for Morris.

[14] Changes were then made to the Revocable Trust Agreements that would force Michael to pay off any debt on the Montana real estate before it could be sold, *see id.* at 153 (Attorney Carmin explaining that the changes would "force Michael's hand"), and Attorney Carmin sent Morris a final draft on August 6. The next week, on August 13, Attorney Carmin met with Morris and Alice at his office to review and execute the documents. Attorney Carmin's assistant was also present. According to the trial court's findings of fact, which are based on Attorney Carmin's description, the following transpired:

> 104. At the Signing Meeting, Alice's physical appearance was appropriate, and she conducted herself appropriately and in conformity with Carmin's previous contacts with her and Morris.
>
> 105. As was Carmin's standard practice, both Carmin and his assistant were to converse with Alice because Alice had been relatively quiet during the drafting process. Given that Morris had taken the lead in those discussions Carmin wanted to ensure that Alice had been aware of the changes and agreed with the provisions in her trust.

106. Carmin was also aware that there were some hard feelings between Morris and Michael. So Carmin wanted to make sure that Alice agreed with the provisions herself, and that Morris was not unilaterally making decisions concerning Michael.

107. Although Alice was quiet during the Signing Meeting, she and Carmin discussed a variety of topics, including financial matters related to debt concerns and the transfer of the Montana Properties, similar to what was contained in his July 27, 2012, and August 6, 2012, correspondences and personal matters.

108. Alice was specifically consulted relative to these changes, and she acknowledged that she agreed that is what she wanted to do.

109. Carmin explained to Alice all the details he and Morris had discussed and confirmed that she understood the same and that she desired the same.

110. During these discussions with Carmin, Alice not only nodded in agreement when the changes and provisions were discussed, but she also verbalized her assent.

111. Nothing in his conversations with Alice led him to suspect that she was experiencing any issues with memory or cognitive functioning.

Joint App. Vol. 2 pp. 26-27. Alice signed the documents, and her signature appeared as follows:



B. ALICE McCOY

Ex. Vol. 1 p. 60.[1] In comparison, Alice's signature looked like this several years earlier:

B. ALICE McCOY

*Id.* at 77.

[15] In contrast to Michael, Douglas, who saw his parents more often because they lived in Bloomington, testified that he didn't notice any cognitive changes in his mother until **after** the estate-planning documents were executed in August 2012—"around late 2013 or early 2014"—and that he didn't know about her 2009 Alzheimer's diagnosis until then either. Joint App. Vol. 2 p. 20. According to Douglas, by early 2015, his mother no longer recognized him.

[16] Morris died in April 2017, and Alice died in July 2021. In October 2021, Michael filed Alice's revocable trust in Monroe County. Michael later moved to set it aside, arguing that Alice didn't have testamentary capacity when she executed the estate-planning documents in August 2012.

[17] Michael deposed Attorney Carmin in December 2023. During the deposition, Michael asked Attorney Carmin about Alice's testamentary capacity when she executed the estate-planning documents in August 2012. For example, Michael

---

[1] After the parties filed their briefs, Michael had to resubmit the exhibits due to formatting defects. The resubmission resulted in four exhibit volumes instead of the original three. However, neither Michael nor Douglas updated the citations in their briefs. As such, many of their citations to the exhibits are wrong.

asked Attorney Carmin if he conducted "any sort of capacity test" for Alice that day, and Attorney Carmin responded:

> That was one because Alice was pretty quiet about things and Morris stated to me that -- I had pre-warned [my assistant] that we would have a conversation with Alice to ensure that she was communicative and lucid and would talk to us and answer questions or at least engage in conversation, provide information as part of the signing. So that was one of the occasions, one of the clients that that was a specific action. And the cause for doing that was not anything Morris had said or Alice had said, it was more what Alice hadn't said. Throughout this process she was relatively quiet, and Morris was taking the lead on everything. It was part of reassuring myself before signing that this was okay.

Ex. Vol. 4 pp. 44-45. Michael also asked Attorney Carmin whether he knew about Alice's cognitive decline or Alzheimer's diagnosis:

> Q Prior to August 13, 2012, so prior to your estate-signing meeting, had you been notified or were you aware that Alice had been diagnosed with Alzheimer's at a moderate level on October 15th, 2009, by her treating neurologist, Dr. Bales?
>
> A No.
>
> Q You have no reason to disagree or question that diagnosis; correct?
>
> **A I had no information about it, so no.**
>
> Q Would that have been information you would have wanted to know when preparing Alice's estate plan in August of 2012?

A Had I known, I would have been more specific and -- in any conversation, but at least in the signing conversation, with regard to talking to her and doing my own assessment that she knew what we were doing today and why. . . .

Q So I'm going to revisit the last question just quickly. Would you have wanted to know that when you were preparing her estate plan in August of 2012?

A I don't like the term want to know. Had I known, I would have acted just a little bit more specifically, but it's certainly not anything I inquired of anybody, is there anything I need to know, anything like that, no.

Q Would it have been helpful to know that?

A Well, I don't know if it would have been helpful, but it would have caused me to be a little bit more specific about capacity questions at signing, yes. . . .

Q Were you aware that Alice underwent [a] neurological evaluation back in 2009 due to, quoting medical records, concerns of cognitive decline as reported by her family, end of the quote, and that her family had noted cognitive impairment for three years prior which had been progressively worsening?

* * * *

A . . . . **I'm not aware of any of that, no.**

* * * *

**Q. Yeah. So no members of her family reported any cognitive decline to you before August 2012; correct?**

**A Not that I recall, no.**

Q And, again, I don't want to put words in your mouth, so would that have been helpful to know or would that have caused you . . . to be more specific in your evaluation?

\* \* \* \*

A I don't want to use the word helpful because that . . . implies that I was hampered in what I was doing, but had I known, I would have -- had I known and had a conversation with Alice, frankly that's when I probably would have videotaped it just to document a little bit better, but not knowing that and nothing in my conversation with Alice raising any questions or any red flags with me, then, no, I didn't go on to videotape it.

*Id.* at 50-54 (emphases added). When Michael asked Attorney Carmin whether he knew in August 2012 that Alice had taken an MMSE in 2009, Attorney Carmin responded:

**I have no knowledge of any medical fact or condition, diagnosis, treatment, anything with regard to Alice and her mental and medical condition prior to June of 2012.** I actually -- **not even after that**, but certainly as of the date of our first conversation about the trust or doing anything, no, at that point I had no information about her condition at all.

*Id.* at 55-56 (emphases added). Finally, Michael asked,

So were you aware that based on the medical records, and I'm moving forward now to June 2nd, 2011, that Alice's mental status continued to decline, she continued to show signs of Alzheimer's disease and/or dementia, she did not know the year, could not spell [the word] world backwards, could not follow a simple written command, again failed the clock test and could not even attempt to write a sentence?

*Id.* at 57. Attorney Carmin again responded that he had "[n]o information regarding any of those matters, nor did [he] know of or learn anything that would cause [him] to suspect any of that." *Id.* at 58.

[18] During discovery, Michael sent a non-party request to Attorney Carmin to produce Alice's file (the attorney-client privilege was waived). The trial court set a three-day evidentiary hearing on the issue of Alice's testamentary capacity for May 28, 2024. About a month before, on April 24, Michael moved to compel discovery from Attorney Carmin. The trial court granted Michael's motion to compel on May 21 and gave Attorney Carmin two days to produce the discovery. Two business days before trial—and about six months after his deposition—Attorney Carmin produced the following two emails: (1) a March 6, 2012 email from Attorney Carmin to a partner in his law firm (marked as "Exhibit D" at the hearing) and (2) an April 27, 2012 email from Morris to Attorney Carmin (marked as "Exhibit C" at the hearing). *See* Tr. Vol. 2 pp. 13 (Michael's attorney explaining that although Attorney Carmin had produced parts of his file earlier, they had just recently received these two emails), 14 (Douglas's attorney taking Michael's attorney's word that they had just received the two emails).

[19]     Exhibit D states:

**From:** Mike Carmin
**Sent:** Tuesday, March 06, 2012 8:38 PM
**To:** Eric Slotegraaf
**Subject:** RE: McCoy

You are gone next week?



PETITIONER'S EXHIBIT D

1

13 of 155

I think I need to have you meet with McCoys.

I am trying to cultivate them as bigger clients. I do some work for the daughter. The son, Doug, is an attorney but has never practiced. He owns and manages rental properties and teaches real estate law at Kelly.

McCoys, as is obvious, have used Bohrer

Alice McCoy probably has very early Alzheimer's I don't know whether they recognize the need to remove her as trustee if something happens to Morris. They do not openly admit her developing limitations.

Could schedule an appointment for after you return? I think they are wanting to hear from me soon, but making the appointment should be sufficient.

Mike

Ex. Vol. 2 pp. 13-14. Exhibit C states:

**Mike Carmin**

| | |
|---|---|
| From: | Morris McCoy [mccoyrentals@att.net] |
| Sent: | Friday, April 27, 2012 1:34 PM |
| To: | Mike Carmin |
| Subject: | RE: Montana |

Dear Mike:

Thank you for your reply received yesterday. I want to make it clear where we stand on the points that you have pointed out that might need clarifying.

I agree that we don't want to quitclaim our interest in the Montana real estate unless and until we have been released from out debts. The promissory Note and the Agricultural Loan Agreement both contain a note of Events Affecting Guarantor. If accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. The fact that my wife is seeing a neurologist and is taking 2 kinds of medicine I thing I could get a note from her Dr. Jamie Bales to this effect if needed. Let me know that if all else fails if you think this provision would help as she does not understand everything that she is signing.

I want to confirm that we want to quitclaim any interest in the Montana real estate to Michael and his wife and forgiveness of loans and financial advances we have made to them and contributions toward the property will Qualify as an early inheritance. The balance of the estate would then go to Janet and Doug after our passing. Let me know if there is anything else that I can help you out with and I will be glad to advise.
Thanks,
Morris

*Id.* at 11.

[20] Immediately before the hearing started on May 28, the parties agreed to submit Attorney Carmin's deposition in lieu of his live testimony even though Attorney Carmin was available to testify. *See* Tr. Vol. 1 p. 35; *see also* Ind. Trial Rule 32(A)(3)(f) ("The deposition of a witness, whether or not a party, may be used by any party for any purpose . . . upon agreement of the parties."); Appellee's Br. p. 39 ("Although it is not reflected in the record, Carmin was present on the first day of the hearing and the parties agreed to let Carmin to [sic] leave the courthouse without calling him to the stand."). Because Attorney Carmin didn't testify live, Michael moved to admit Exhibits C and D through three different witnesses: (1) his medical expert, neuropsychologist Dr. Crystal Ramos, who opined that Alice lacked testamentary capacity when she executed the estate-planning documents in August 2012; (2) his estate-planning expert, attorney Rebecca Geyer, who also opined that Alice lacked testamentary capacity in August 2012; and (3) Douglas's medical expert, neuropsychologist Dr. Polly Westcott, who opined that Alice had testamentary capacity in August 2012. Specifically, Michael argued that Exhibits C and D were admissible under Indiana Evidence Rule 703 as well as to impeach Attorney Carmin's credibility.[2] Each time Michael offered the exhibits, Douglas objected on

---

[2] Douglas asserts that Michael didn't argue below that Exhibits C and D were admissible to impeach Attorney Carmin's credibility or mention Evidence Rule 806 and therefore he has waived review of this issue. *See* Appellee's Br. p. 31 ("Michael never argued below the exhibits were being offered for Carmin's impeachment. He never uttered the words 'impeach,' 'impeachment,' 'credibility,' 'truthfulness,' or 'veracity' (or variations thereof) before the trial court. Likewise, Michael never mentioned or made any argument about Rule 806 to the trial court."). But as Michael responds, he did argue below that Exhibits C and D "contradicted" Attorney Carmin's deposition testimony. *See* Appellant's Br. p. 21 (citing Tr. Vol. 2 p. 10); Appellant's Reply Br. pp. 8 ("Semantics aside, the substance of Michael's point was not lost on anyone. He wanted to contradict—or impeach—a witness's testimony with a document."), 10 (acknowledging that "no

hearsay grounds. The court sustained Douglas's hearsay objections and did not admit Exhibits C or D into evidence or allow Michael to ask any of the witnesses about the content of the emails. In fact, the court never looked at Exhibits C and D and set up a procedure whereby at the end of the three-day hearing the judge left the courtroom when they were tendered for the record. *See* Tr. Vol. 3 pp. 69-70, 174-78.

[21] In January 2025, the trial court issued an order that Alice had testamentary capacity when she executed the estate-planning documents in August 2012 and therefore her revocable trust is valid. In reaching this conclusion, the court relied largely on Attorney Carmin's and Dr. Westcott's testimony. *See, e.g.*, Joint App. Vol. 2 p. 28 ("Dr. Polly Westcott's education, training, and experience in neuropsychology, particularly Alzheimer's and forensic neuropsychology, qualify her to assist the Court in understanding Alice's condition and testamentary capacity on August 13, 2012" and "Carmin was the best suited to opine regarding Alice's testamentary capacity on August 13, 2012, as the estate planning attorney with the personal and face-to-face experience and communications with Alice on that date.").

[22] Michael now appeals. The distribution of Alice's trust assets has been stayed pending appeal.

---

one raised [Evidence Rule 806] by name below" but that "once again, no one was in the dark that Michael was attempting to impeach a witness who testified by deposition"). There is no waiver.

# Discussion and Decision

[23] Michael appeals the trial court's order that Alice had testamentary capacity when she executed the estate-planning documents in August 2012 and therefore her revocable trust is valid. "The capacity of a settlor that is required to create, amend, revoke, or add property to a revocable trust is the same as the capacity of a testator that is required to make a will." Ind. Code § 30-4-2-10(b). Every person is presumed to be of sound mind to execute a will. *In re Tr. of Rhoades*, 993 N.E.2d 291, 299 (Ind. Ct. App. 2013). To rebut this presumption, a party must show that the testator, at the time the document is executed, lacks the mental capacity to know: "(1) the extent and value of [her] property; (2) those who are the natural objects of [her] bounty; and (3) their deserts, with respect to their treatment of and conduct towards [her]." *Id.*

[24] Michael contends that the trial court erred in excluding Exhibits C and D. A trial court has broad discretion to admit or exclude evidence. *Abbas v. Neter-Nu*, 261 N.E.3d 233, 248 (Ind. 2025). "This Court will only disturb a trial court's ruling if it amounts to an abuse of discretion, meaning the court's decision is clearly against the logic and effect of the facts and circumstances or it is a misinterpretation of the law." *Id.* (quotation omitted).

## I. The trial court erred by not admitting Exhibits C and D so that Michael could attack Attorney Carmin's credibility

[25] Michael first argues that Exhibits C and D were admissible to attack Attorney Carmin's credibility because the emails are "flatly inconsistent with" and

"directly contradict[]" his deposition testimony that he didn't know about Alice's capacity issues. Appellant's Br. p. 35; Appellant's Reply Br. p. 12. "Any party, including the party that called the witness, may attack the witness's credibility." Ind. Evidence Rule 607. There are five primary ways to do so:

> (1) through a showing that the witness has made statements inconsistent with his testimony;

> (2) through a showing that the witness is biased or prejudiced for or against a party;

> (3) through a general or specific attack upon the witness's character;

> (4) through a showing of a defect in the witness's capacity to observe and recall the events about which testimony is given; and

> (5) contradiction of the witness's testimony by other evidence.

12 Robert Lowell Miller, Jr., Indiana Practice, *Indiana Evidence* § 607.101 (4th ed. Aug. 2025 update); *see also Ellyson v. State*, 603 N.E.2d 1369, 1375 (Ind. Ct. App. 1992) (listing six methods, one of which was later eliminated by the adoption of Evidence Rule 610).

## A. Exhibit D is admissible as Attorney Carmin's prior inconsistent statement

Michael first asserts that Exhibit D, which is Attorney Carmin's email to his law partner, is admissible as a prior inconsistent statement. In Exhibit D, Attorney Carmin wrote in March 2012 that (1) Alice "probably has very early

Alzheimer's," (2) he didn't know whether her family "recognize[s] the need to remove her as trustee if something happens to Morris," and (3) her family "do[es] not openly admit her developing limitations." Evidence Rule 613 "allows the use of a prior inconsistent statement to impeach a witness," but "not as substantive evidence of the matter reported." *Jackson v. State*, 925 N.E.2d 369, 375 (Ind. 2010), *reh'g denied*; *Young v. State*, 746 N.E.2d 920, 926 (Ind. 2001); *see also* 12 Robert Lowell Miller, Jr., at § 613.101 ("[P]roof of the prior statement ordinarily is admissible, not to prove the truth of the witness's prior statement, but solely to show that the witness's trial testimony constitutes only his most recent tale."). "The use of a prior inconsistent statement to impeach a witness's credibility requires that the statement actually be inconsistent with another statement." *Pribie v. State*, 46 N.E.3d 1241, 1249 (Ind. Ct. App. 2015), *trans. denied*; *see also Dunlap v. State*, 761 N.E.2d 837, 843 n.6 (Ind. 2002).

[27]     Here, we have little trouble concluding that Attorney Carmin made statements in his March 2012 email that are inconsistent with statements he later made in his December 2023 deposition. For example, after extensive questioning about what he knew about Alice's mental capacity when she executed the estate-planning documents in August 2012, Attorney Carmin denied knowing anything about Alice's mental or medical condition:

> **I have no knowledge of any medical fact or condition,
> diagnosis, treatment, anything with regard to Alice and her
> mental and medical condition prior to June of 2012**. I actually --
> **not even after that**, but certainly as of the date of our first

conversation about the trust or doing anything, no, at that point I had no information about her condition at all.

Ex. Vol. 4 pp. 55-56 (emphases added). Michael then asked:

> So were you aware that based on the medical records, and I'm moving forward now to June 2nd, 2011, that Alice's mental status continued to decline, she continued to show signs of Alzheimer's disease and/or dementia, she did not know the year, could not spell [the word] world backwards, could not follow a simple written command, again failed the clock test and could not even attempt to write a sentence?

*Id.* at 57. Attorney Carmin again responded that he had "[n]o information regarding any of those matters, **nor did I know of or learn anything** that would cause me to suspect any of that." *Id.* at 58 (emphasis added). But these statements are flatly inconsistent with Attorney Carmin's statement to his law partner that Alice "probably" has "very early Alzheimer's," that her family members "do not openly admit her developing limitations," and that he didn't know if her family knows that she isn't qualified to serve as trustee of Morris's trust.

[28] Evidence Rule 613 sets forth the procedure for impeaching a witness with a prior inconsistent statement and addresses when extrinsic evidence of that statement is admissible:

> **(a) Showing or Disclosing the Statement During Examination.** When examining a witness about the witness's prior statement, a party need not show it or disclose its content to the witness. But

the party must, on request, show it or disclose its contents to an adverse party's attorney.

**(b) Extrinsic Evidence of a Prior Inconsistent Statement.** Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

Evidence Rule 613(b)'s foundation requirement, however, does not apply where the declarant does not testify live because a witness who testifies by deposition obviously cannot be personally confronted with impeachment evidence at trial. Because Attorney Carmin testified by deposition rather than live, Evidence Rule 806 governs. That rule provides:

**When a hearsay statement**—or a statement described in Rule 801(d)(2)(C), (D), or (E)—**has been admitted in evidence**, **the declarant's credibility may be attacked,** and then supported, **by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.** If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

Evid. R. 806 (emphases added). Evidence Rule 806, which mirrors the federal rule, has not previously been construed by an Indiana court. The federal rule, as

one leading treatise notes, is "seldom invoked or seen in practice." 5 Mueller & Fitzpatrick, *Federal Evidence* § 8:137 (4th ed. July 2025 update).

[29] Under Evidence Rule 806, when a hearsay statement has been admitted into evidence, the hearsay declarant's credibility may be attacked as though they had testified in person. *See* 13 Robert Lowell Miller, Jr., Indiana Practice, *Indiana Evidence* § 806.101 (4th ed. Aug. 2025 update) (explaining that a hearsay declarant "is no less a witness than one who testifies in person"); *see also* Fed. R. Evid. 806 advisory committee's note to 1972 proposed rules ("The declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified."); 5 Mueller & Fitzpatrick at § 8:138 ("When an out-of-court statement is admitted as proof of what it asserts, Rule 806 leaves no doubt that any party who wishes to discredit the speaker may do so."). And when an inconsistent statement is involved, Evidence Rule 613(b)'s foundation requirements are "waive[d]." 12 Robert Lowell Miller, Jr., at § 613.201; *see also* 2 Kenneth S. Broun, *McCormick on Evidence* § 324.2 (9th ed. Feb. 2025 update) ("With regard to impeachment by prior inconsistent statements, the rule eliminates the requirement, otherwise applicable to statements made by witnesses who testify in person, that an opportunity be afforded for them to explain or deny the inconsistency." (footnotes omitted)). But other rules of evidence, including Evidence Rule 403's balancing test and authentication, apply. 12 Robert Lowell Miller, Jr., at § 613.201; 13 Robert Lowell Miller, Jr., at § 806.101; *see also* 2 Kenneth S. Broun at § 324.2 ("When the declarant does

not take the stand, the procedure for conducting the impeachment should be relaxed, but separate restrictions in other rules are not eliminated." (footnotes omitted)).

[30] Here, the parties agreed to submit Attorney Carmin's deposition in lieu of his live testimony. His deposition constitutes hearsay—an out-of-court statement offered into evidence to prove the truth of the matter asserted. *See* Evid. R. 801(c); *Garner v. State*, 777 N.E.2d 721, 724 (Ind. 2002) ("Generally, deposition testimony of an absent witness offered in court to prove the truth of the matter asserted constitutes classic hearsay."). The parties' agreement to submit the deposition under Trial Rule 32 doesn't change the hearsay character of the statement for Evidence Rule 806 purposes. Although Trial Rule 32 supplies a procedural vehicle for using deposition testimony in lieu of live testimony, it does not transform an out-of-court statement offered for its truth into something other than hearsay, and it does not displace Evidence Rule 806's guarantee that a hearsay declarant's credibility may be attacked. Because the deposition constitutes an out-of-court statement offered for the truth of the matter asserted and therefore hearsay under Evidence Rule 801(c), Evidence Rule 806 applies.[3]

---

[3] The advisory committee's note to Federal Rule of Evidence 806 contemplates that the hearsay statement can be a deposition:

> When the impeaching statement was made prior to the hearsay statement, differences in the kinds of hearsay appear which arguably may justify differences in treatment. If the hearsay consisted of a simple statement by the witness, e.g. a dying declaration or a declaration against interest, the feasibility of affording him an opportunity to deny or explain encounters the same practical impossibility as where the statement is a subsequent one, just discussed, although here the impossibility arises from the total absence of anything resembling a hearing at which the matter could be put to him. The courts by a large majority have ruled in favor of allowing the statement to be used under these circumstances. McCormick § 37, p. 69; 3 Wigmore § 1033. **If,**

And under that rule, the trial court was authorized to admit Exhibit D into evidence.

[31] As explained above, the admission is subject to other rules of evidence, including Evidence Rule 403's balancing test and authentication. Here, the issue of Alice's testamentary capacity was tried to the trial court and not a jury. Trial judges are "presumed to know the intricacies of the rules of evidence and to consider the evidence" for the correct purpose. *Leisure v. Wheeler*, 828 N.E.2d 409, 417 n.3 (Ind. Ct. App. 2005). Here, however, the trial court never looked at either exhibit and therefore did not conduct the balancing test. But there is no concern that the probative value of the impeachment evidence is substantially outweighed by the danger of any of the concerns listed in Evidence Rule 403. The trial was to the bench, so there was no risk of jury confusion or misuse, the emails go to the central issue in the case rather than a collateral matter, and the

---

> **however, the hearsay consists of former testimony or a deposition,** the possibility of calling the prior statement to the attention of the witness or deponent is not ruled out, since the opportunity to cross-examine was available. It might thus be concluded that with former testimony or depositions the conventional foundation should be insisted upon. Most of the cases involve depositions, and Wigmore describes them as divided. 3 Wigmore § 1031. Deposition procedures at best are cumbersome and expensive, and to require the laying of the foundation may impose an undue burden. Under the federal practice, there is no way of knowing with certainty at the time of taking a deposition whether it is merely for discovery or will ultimately end up in evidence. **With respect to both former testimony and depositions the possibility exists that knowledge of the statement might not be acquired until after the time of the cross-examination.** Moreover, the expanded admissibility of former testimony and depositions under Rule 804(b)(1) calls for a correspondingly expanded approach to impeachment. The rule dispenses with the requirement in all hearsay situations, which is readily administered and best calculated to lead to fair results.

(Emphases added). That is precisely what occurred here—Exhibits C and D were not produced until about six months after Attorney Carmin's deposition, making it impossible for Michael to confront him with the emails at that time.

probative value of evidence directly contradicting the only witness who observed Alice at the signing is high.

[32] As for authentication, Exhibit D was an email that Attorney Carmin had sent, and it came from his own file pursuant to a court order compelling discovery. This satisfies the authentication requirement under Evidence Rule 901. The trial court erred by not admitting Exhibit D so that Michael could impeach Attorney Carmin's deposition testimony with his prior inconsistent statements in the email.[4]

## B. Exhibit C is admissible to contradict Attorney Carmin's deposition testimony

[33] Exhibit C requires a separate analysis. This is because Exhibit D contains a prior inconsistent statement of Attorney Carmin, which is governed by Evidence Rule 613. Exhibit C, however, is Morris's email to Attorney Carmin. Although Exhibit C does not contain a prior inconsistent statement of Attorney Carmin, it is nonetheless admissible to contradict his deposition testimony. *See* 12 Robert Lowell Miller, Jr., at § 607.101; 5 Mueller & Fitzpatrick at § 8:138 (explaining that an attack on an out-of-court speaker "may proceed by using any and all five of the recognized methods of impeachment" and that for the

---

[4] Michael argues that the part of Attorney Carmin's email about trying to "cultivate" the McCoys as "bigger clients" shows that he was "biased," which is another way to impeach a witness's credibility. Appellant's Br. p. 38. Specifically, he claims that this portion of the email "indicated that at the time of the signing, Morris and Douglas were clients of a competing law firm, and Carmin was trying to steal them away." *Id.* We agree with Douglas that this is too tenuous of a connection to show bias. Accordingly, the trial court shall not consider this part of the email for purposes of bias.

fifth method (contradiction), "the rules governing contradiction of witnesses apply equally to contradiction of out-of-court declarants").

[34] Michael sought to contradict Attorney Carmin's deposition testimony with Morris's email. When Michael asked Attorney Carmin during the deposition if any of Alice's family members had "reported any cognitive decline to [him] before August 2012," Attorney Carmin responded, "Not that I recall, no." Ex. Vol. 4 p. 53. Attorney Carmin also testified that he had "no knowledge" of "anything" related to Alice's medical or mental condition. *Id.* at 55. But in Morris's April 2012 email to Attorney Carmin, Morris stated that (1) Alice is "seeing a neurologist," Dr. Jamie Bales, and "taking 2 kinds of medicine"; (2) he might be able to get her declared incompetent if Attorney Carmin thought it "would help"; and (3) Alice "does not understand everything she is signing." Ex. Vol. 2 p. 11. Exhibit C met the authentication and Evidence Rule 403 balancing test for the same reasons as Exhibit D. The trial court erred by not admitting Exhibit C so that Michael could contradict Attorney Carmin's deposition testimony with the email under Evidence Rule 806.

## II. The trial court erred in not allowing Michael to refer to Exhibits C and D during his direct and cross-examination of the experts

[35] Michael also argues that the trial court erred in excluding Exhibits C and D during the questioning of the experts under Evidence Rule 703, which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.

> Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

Relatedly, under Evidence Rule 705, on direct examination an expert may state an opinion and give the reasons for it "without first testifying to the underlying facts or data"; however, they "may be required to disclose those facts or data on cross examination." *See also* 13 Robert Lowell Miller, Jr., at § 703.109 (explaining that Evidence Rule 705 "entitles the cross-examiner, subject to Rule 403, to inquire into the bases for the expert's opinion").

[36] Michael argues that Exhibits C and D were admissible through direct examination of his experts, Dr. Ramos and Geyer, as well as through cross-examination of Douglas's expert, Dr. Westcott. We begin with the direct examination of Dr. Ramos and Geyer, during which Michael moved to admit the emails as material they relied on in reaching their opinions. Specifically, Dr. Ramos and Geyer testified that in determining testamentary capacity: (1) it's important to rely on the observations of family members and the attorneys who prepared the estate-planning documents, (2) experts in their field routinely do so, and (3) they considered Exhibits C and D in reaching their opinions.[5] The trial court acknowledged that Michael's experts could rely on Exhibits C and D in reaching their conclusions; however, the court noted that whether those

---

[5] Dr. Ramos wasn't sure if she had Exhibit C before or after she issued her report and gave her deposition. *See* Tr. Vol. 1 p. 122.

emails were admissible was another matter. *See* Tr. Vol. 2 p. 15 ("The other aspect, though, goes into the underlying information. Is that something that automatically comes in or is it admissible, and is that addressed in 703?"). The court stated it didn't see "a reason . . . to have those documents before it" and sustained Douglas's hearsay objections, thereby preventing Michael from questioning Dr. Ramos or Geyer about the content of the emails. *Id.*

[37] Douglas claims that the trial court properly excluded Exhibits C and D because Evidence Rule 703 "does not speak to the admissibility of hearsay underlying an expert's opinion; that must be independently established." Appellee's Br. p. 33. Unlike Federal Rule of Evidence 703, Indiana Evidence Rule 703 "does not expressly provide a vehicle by which the jury can learn of the underlying material and so decide how much or little weight to afford the opinion." 13 Robert Lowell Miller, Jr., at § 703.109.[6] To fill this gap, "Indiana courts have discretion to allow the direct examiner to elicit the otherwise inadmissible facts or data for the limited purpose of allowing the jury to evaluate the expert's opinion, and not as substantive evidence." *Id.* "The judge should instruct the jury as to the limited use to be made of the evidence." *Id.* (citing Evid. R. 105).

---

[6] Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. **But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.**

(Emphasis added). Indiana Evidence Rule 703 does not contain the last sentence.

"In exercising this discretion, the judge should balance the probative value of the evidence for this limited purpose against the risk that the jury will be unable to follow the limiting instruction and instead consider the inadmissible facts or data as substantive evidence." *Id.* In other words, care should be taken so that "an expert's reliance on hearsay [is not] employed simply as a conduit for placing the [other] person's statement before the jury." *Id.*; *see also Schmidt v. State*, 816 N.E.2d 925, 939 (Ind. Ct. App. 2004), *reh'g denied*, *trans. denied*.

[38]  The trial court erred in not allowing Michael to question Dr. Ramos and Geyer about the content of Exhibits C and D during direct examination. Evidence Rule 703 does not independently establish the admissibility of the emails themselves—that basis is addressed in Section I. What Evidence Rule 703 authorizes, together with Evidence Rule 705, is the elicitation of otherwise inadmissible facts or data during expert examination for the limited purpose of helping the factfinder evaluate the expert's opinion, and not as substantive evidence of the facts asserted. Applying that rule here, the trial court should have permitted the questioning. Because this case was tried to the bench, there was no risk that the court would misuse the content of the emails as substantive evidence of Alice's incapacity rather than as material for evaluating why Dr. Ramos and Geyer reached the conclusions they did. And given that the central issue is Alice's mental condition in August 2012, Attorney Carmin's email acknowledging Alice's probable Alzheimer's diagnosis and Morris's email stating that Alice did not understand what she was signing were highly relevant to those conclusions. The trial court should have allowed Michael to question

Dr. Ramos and Geyer about the content of the emails and how much weight they placed on them in forming their opinions.

[39] We now turn to cross-examination. During his cross-examination of Dr. Westcott, Michael again moved to admit Exhibits C and D. Michael asked Dr. Westcott if statements by Morris or Attorney Carmin would be relevant to her analysis. *See* Tr. Vol. 3 pp. 10-13. She said they would, if they were not suffering from any cognitive decline. Michael then asked her if she had reviewed statements from either person, and she said she had not. Michael then confirmed that Dr. Westcott hadn't reviewed Attorney Carmin's file and thus had not seen Exhibits C and D. When asked if "statements by a spouse to the attorney who drafted the estate plan" would have been useful to her, she responded, "I have everything that I need . . . without those statements." *Id.* at 18. Michael stated that he'd "like to be able to share the statements if she's [going to] testify that she doesn't need the statements." *Id.* Douglas objected on hearsay grounds, and the trial court ruled, "I'll allow you this general discussion . . . [but] we're not talking about C & D." *Id.* at 19. Michael maintained that questioning Dr. Westcott about Exhibits C and D was "fair game" but proceeded without them. *Id.* Among other things, he posed hypotheticals to Dr. Westcott, some of which Douglas says touched on the content of the emails. *See id.* at 45-58; Appellee's Br. p. 30.

[40] In a case decided before the Indiana Rules of Evidence were adopted, this Court found that a trial court did not abuse its discretion in not allowing cross-examination of an expert about evidence that the expert did not rely upon. *See*

*Clouse v. Fielder*, 431 N.E.2d 148, 155-56 (Ind. Ct. App. 1982), *reh'g denied*. No Indiana case has cited *Clouse* for this proposition. To the extent *Clouse* could be read to establish a categorical rule that an expert can never be cross-examined about facts or data upon which they didn't rely, we decline to follow it. This is because the purpose for direct and cross is the same: helping the factfinder evaluate the expert's opinion. Trial courts have discretion to allow the cross-examiner to elicit otherwise inadmissible facts or data for the limited purpose of allowing the factfinder to evaluate the expert's opinion, and not as substantive evidence. *See Walker v. Cuppett*, 808 N.E.2d 85, 98-99 (Ind. Ct. App. 2004) (in a case where an expert relied on medical records in reaching his conclusion, holding that under Evidence Rule 705, the expert could be cross-examined about "notations in those medical records that arguably undermined his opinion, at the very least for impeachment purposes"). Again, there was no risk that the trial court would misuse the emails. And the emails were particularly relevant to whether Dr. Westcott's opinion that Alice had testamentary capacity in August 2012 is reliable in light of information she never reviewed. The trial court erred in not allowing Michael to cross-examine Dr. Westcott about the contents of Exhibits C and D.

## III. We vacate the trial court's order that Alice had testamentary capacity in August 2012 and remand with instructions for the court to consider Exhibits C and D

[41] As just explained, the trial court erred in not admitting Exhibits C and D to allow Michael to use them to attack Attorney Carmin's credibility. The court

also erred in not allowing Michael to refer to the emails during his direct and cross-examination of the experts to evaluate their opinions. "No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." Ind. Appellate Rule 66(A); *see also Abbas*, 261 N.E.3d at 248 (applying rule in jury trial). The errors here were not harmless because the excluded emails went directly to the credibility of the two witnesses upon which the trial court primarily based its findings—Attorney Carmin and Dr. Westcott. Accordingly, we vacate the trial court's order finding Alice had testamentary capacity in August 2012. On remand, the trial court shall admit Exhibits C and D, reweigh the evidence, and issue a new order. If Michael wishes, the trial court shall hold a supplemental evidentiary hearing before issuing the new order so that he can (1) re-examine Dr. Ramos and Geyer about the content of Exhibits C and D and the weight they placed on the emails in forming their opinions and (2) cross-examine Dr. Westcott about the impact of the emails on her conclusion that Alice had testamentary capacity in August 2012.

[42] Reversed and remanded.

Mathias, J., and Pyle, J., concur.

ATTORNEYS FOR APPELLANT

Christopher E. Kozak
Nicholas J. Bognanno
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

Carla V. Garino
William J. Webster
Brianne N. Mershman
Webster & Garino LLC
Westfield, Indiana


ATTORNEYS FOR APPELLEE

Lonnie D. Johnson
Justin K. Schwemmer
Robert D. Esrock
Clendening Johnson & Bohrer, P.C.
Bloomington, Indiana